# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL COUNCIL FOR ADOPTION,
     225 N. Washington Street
     Alexandria, VA 22314,

          *Plaintiff*,

   v.

MICHAEL R. POMPEO, *in his official*
*capacity as U.S. Secretary of State*,
     2201 C Street, N.W.
     Washington, D.C. 2052;

CARL C. RISCH, *in his official capacity as*
*Assistant Secretary of State for Consular*
*Affairs, U.S. Department of State*,
     2201 C Street, N.W.
     Washington, D.C. 2052;

SCOTT RENNER, *in his official capacity as*
*Director of the Office of Children's Issues,*
*U.S. Department of State*,
     2201 C Street, N.W.
     Washington, D.C. 2052;

TRISH MASKEW, *in her official capacity as*
*Chief of the Adoptions Division, U.S.*
*Department of State*,
     2201 C Street, N.W.
     Washington, D.C. 2052; and

U.S. DEPARTMENT OF STATE,
     2201 C Street, N.W.
     Washington, D.C. 2052;

          *Defendants.*

Case No. 1:18-cv-2704

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

## **INTRODUCTION**

1.      Each year, thousands of U.S. families adopt children from other countries, and

thousands more seek to open their homes to children in desperate need of a family.  Many of

these children suffer from medical conditions that, while treatable in the United States, are often

fatal or debilitating in their country of birth.  And without an adoptive family, these orphaned

children face a heightened risk of dying in institutionalized care while awaiting adoption or

falling into the underworld of drugs, crime, and sex trafficking when they age out of their home

countries' orphanage systems.  Cross-border (or, "intercountry") adoptions open up critical and

even life-saving opportunities for these children.

2.      For decades, in both intercountry and domestic adoptions, adoption agencies in

the United States have used a practice called "soft referrals" to match prospective adoptive

parents with adoptable children.  In intercountry soft-referral adoptions, prospective parents are

matched to a specific child, but that match is contingent on the parents completing a home study,

submitting a dossier of required adoption documents, receiving pre-approval from U.S.

Citizenship and Immigration Services, and completing a series of training requirements.  In

addition, the child must be confirmed eligible for adoption and the child's country of origin must

approve the adoption.  These steps must be performed in any intercountry adoption.

3.      Soft referrals help to achieve critical humanitarian aims.  They are most often

used to match orphaned children with their U.S. relatives; to match children with special needs to

prospective adoptive parents particularly suited to meet those needs; or to encourage individuals

who would not otherwise consider adoption to commit to the adoption of a particular (often hard-

to-place) child.  In some countries, a soft referral must be made in order to initiate the necessary

(and costly) steps to confirm the child's eligibility for international adoption.

4.     The aim of this lawsuit is to save soft referrals, and the many children whose lives and futures may hang in the balance, from a procedurally and substantively improper bureaucratic assault.  Earlier this year, in a series of documents denoted as "guidance," the U.S. Department of State prohibited soft referrals in *all* intercountry adoptions and authorized "adverse action"—including a suspension or loss of accreditation—against any adoption agency that makes a soft referral.  *See* Exs. A–C (collectively, the "Soft Referral Ban").  In these documents, the Department declared categorically that "a 'soft referral' is not acceptable practice under [federal adoption] regulations," and that adoption agencies have a "legal responsibilit[y]" not to make soft referrals under any circumstances.

5.     The Department has claimed that the Soft Referral Ban merely "clarifies existing policies based on current regulations that have been in place since 2006," but its own prior statements show otherwise.  Just two years ago, the Department stated in a proposed (and ultimately withdrawn) rule that "an agency *can* match a child to a family that has not completed its home study and training" and that adoptive families *can* commit to a particular child before that child's eligibility is confirmed.  *See* Intercountry Adoptions, 81 Fed. Reg. 62,322, 62,324–25 (proposed Sept. 8, 2016) (emphasis added).  In sharp contrast, the Soft Referral Ban now says that federal law does *not* allow a match to be made "before confirmation of the child's eligibility to be adopted … or approval of the prospective adoptive parents' home study and associated background checks." Ex. B, at 1 (acronym omitted).  The "guidance" documents that make up the Soft Referral Ban do not acknowledge that the Department's current position is the polar opposite of what the Department said in 2016—much less explain the reason for the change.

6.     The Soft Referral Ban also fails to identify any basis for the implausible conclusion that soft referrals are *always* harmful to children.  For one, the Department failed to

acknowledge that soft referrals have a long pedigree in intercountry and domestic adoptions and that soft referrals increase the number of children who are adopted and the number of families who are open to adopting.  Nor does the Soft Referral Ban grapple with the reality that soft referrals are, in some circumstances, the optimal way to connect a child with a family.  Most critically, the Department has not acknowledged the fact that, in some circumstances, a soft referral can be the difference between life and death for a sick and orphaned child, or that soft referrals are sometimes legally required by a child's country of origin.

7.      None of this is to deny that soft referrals can be abused, or that the Department could take appropriate steps to address the misuse of soft referrals.  The Department could rationally conclude that there is a need to issue true guidance—for example, a non-binding statement of factors that adoption agencies could consider in deciding whether a soft referral is appropriate in any individual case.  And if the Department believes new binding regulations are necessary and appropriate, it is free to initiate a rulemaking process at any time, as it did in 2016 before withdrawing its proposed rules for further study.  But the Soft Referral Ban goes much too far and too fast to be deemed lawful.  It should be set aside for three reasons.

8.      First, the Soft Referral Ban violates the APA's procedural requirements for making and amending legislative rules.  Binding legal requirements cannot be imposed on private parties by federal agencies unless (with exceptions not relevant here) the agency follows the notice-and-comment process, and thereby gives the public advance notice of the rules that the agency proposes to impose and an opportunity to be heard.  The Department did not follow that procedure here.  Instead, the Department circumvented notice and comment by announcing the Soft Referral Ban in a series of "guidance" documents that suddenly appeared on the Department's website.

9.      Second, the Soft Referral Ban is contrary to law.  It purports to prohibit soft referrals *categorically*, and to do so as a matter of federal law, declaring that soft referrals are never in the "best interest of children."  Those conclusions cannot be squared with existing Department regulations that (unlike the Soft Referral Ban) were properly adopted pursuant to notice and comment.  Those regulations declare that the "best interests of children" standard is governed by *state law*, not federal law.  And state law makes clear that the "best interests" standard is highly individualized and case-specific—appropriately so, since every child and every family circumstance is different and deserves to be weighed individually rather than mechanically.  The Soft Referral Ban does not consider how soft referrals are viewed under state law, much less explain how a categorical ban on soft referrals can be harmonized with state-law standards that broadly require individualized determinations of a child's best interests.

10.      Finally, the Soft Referral Ban is classically arbitrary and capricious.  The Department failed to engage in reasoned decision-making before concluding that *all* soft referrals are *always* bad for children.  For one, the Department did not identify any evidence that could remotely support its sweeping conclusion.  The Soft Referral Ban does point to two instances of fraudulent conduct by adoption service providers.  Such conduct is already illegal under existing law, however, and regardless, it is irrational to conclude from two instances of misuse alone that soft referrals are *categorically* harmful to children.

11.      The Department's approach is particularly problematic because it did not give any consideration to the benefits of soft referrals, or the situations where a soft referral is necessary (either legally or practically) to complete an adoption.  Without soft referrals, children who would otherwise be adopted will remain in orphanages longer.  Soft referrals are used to unite orphaned children with aunts, uncles, cousins, and siblings residing in the United States.  Soft

referrals enable accredited agencies to recruit families who might not yet be considering adoption, and allow social workers to critically evaluate a child's individualized needs alongside the prospective parents' suitability and capacity for an adoptive placement.  These are undoubted benefits that must be weighed in the balance before any categorical conclusion could be rationally drawn about whether soft referrals are in the best interests of children.  The Department did not weigh them.  Its conclusion that all soft referrals must be banned is therefore arbitrary and capricious, and thus cannot stand.

12.     For these reasons, on behalf of its members and to protect the families and children who will be harmed by the Department's actions, Plaintiff National Council For Adoption respectfully seeks a declaration that the Soft Referral Ban is unlawful and asks the Court to enjoin enforcement of that Ban.

## PARTIES

13.     Plaintiff National Council For Adoption ("NCFA") is a non-profit organization that advocates for and promotes a culture of adoptions.  Since its founding in 1980, NCFA has grown to an association of approximately 100 adoption agencies, the majority of which are accredited to facilitate intercountry adoptions.

14.     Defendant Michael R. Pompeo is sued in his official capacity as U.S. Secretary of State.  Secretary Pompeo has ultimate responsibility for the federal government's intercountry adoption policy and for enforcing federal intercountry adoption laws, including the Intercountry Adoption Act of 2000 ("IAA"), the Universal Accreditation Act of 2012 ("UAA"), and the intercountry adoption regulations, 22 C.F.R. §§ 96.0–.111.

15.     Defendant Carl C. Risch is sued in his official capacity as Assistant Secretary of State for Consular Affairs.  Mr. Risch is the head of the Bureau of Consular Affairs, a division of the U.S. Department of State tasked with implementing federal law on intercountry adoptions.

16.     Defendant Scott Renner is sued in his official capacity as the Director of the Office of Children's Issues ("OCI").  OCI, which is part of the Bureau of Consular Affairs, carries out the Department of State's responsibilities as the U.S. Central Authority for the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption ("Hague Adoption Convention" or the "Convention"), and thus is responsible for day-to-day oversight and implementation of federal intercountry adoption law.

17.     Defendant Trish Maskew is sued in her official capacity as the Chief of the Adoptions Division within OCI.  The Adoptions Division is responsible for shaping the Department's policy regarding intercountry adoption.

18.     Defendant the U.S. Department of State (the "Department") is an executive agency of the United States and is a designated central authority under the Hague Adoption Convention.  The Department has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

20.     NCFA has standing to bring this Action in its own right and on behalf of its member adoption agencies.  NCFA's members include adoption agencies whose conduct is subject to and regulated by the Department's pronouncements, including the Soft Referral Ban. NCFA's member agencies regularly made soft referrals in appropriate cases before the Department issued the Soft Referral Ban, but have been forced to stop making soft referrals as a result of the Ban.  Accordingly, at least one of these agencies would have standing to challenge the Soft Referral Ban in its own right.  This Action, moreover, is germane to NCFA's purpose, and neither the claims asserted nor the relief requested would require any individual member to participate in the suit.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

22.     The Soft Referral Ban is a final agency action within the meaning of 5 U.S.C. § 704.  The Soft Referral Ban prohibits NCFA's members from participating in soft referrals in all circumstances, and subjects them to penalties, including loss of accreditation to operate in intercountry adoption, if they fail to comply with the Ban.  NCFA members have been required by foreign governments or the Department's accrediting entity to demonstrate their "compliance" with the Soft Referral Ban.  Under the Ban, any agency that makes a soft referral faces the prospect of imminent and potentially devastating sanctions.

## FACTUAL BACKGROUND

### A.     Overview of Intercountry Adoption

23.     Each year, thousands of American families welcome a child from another country into their home, and tens of thousands more go through the process of qualifying for intercountry adoption.  This was not always so.  The practice of adopting children from other countries was all-but unknown in the United States until the mid-20th century.

24.     In the aftermath of World War II, concern for refugees and displaced children led many Americans (including many recently returned soldiers) to adopt thousands of orphaned children from war-torn countries.  Wars in Korea and Vietnam led to similar spikes in intercountry adoptions.  More recently, Americans have been moved to adopt children left orphaned by natural disasters or humanitarian crises.

25.     In 1993, the Hague Conference on Private International Law concluded the Hague Adoption Convention, which gives the international community's "ungrudging endorsement" to

intercountry adoption, and establishes "internationally agreed norms and procedures designed to protect both the children involved and the interests of the children's birth and adoptive parents."[1]

26.     The United States signed the Hague Adoption Convention in 1994.  Six years later, Congress enacted the IAA to "provide for implementation by the United States of the Convention."  42 U.S.C. § 14901(b)(1).  Following the promulgation of implementing regulations in 2006, *see* 22 C.F.R. *et seq.*, the United States ratified the Convention in 2007. Under the IAA, the Department is required to "consider any standards or procedures developed or proposed by, and the views of, individuals and entities with interest and expertise in international adoptions" in developing federal adoption regulations.  42 U.S.C. § 14923(a)(2). The IAA expressly incorporates the APA's rulemaking procedures, requiring notice and comment for "the development and issuance of regulations under" the statute.  *Id.* § 14923(a)(3).

27.     Both the Convention and the IAA establish the "best interests of the child" as the guiding standard for any adoption action.  *See, e.g.*, Hague Adoption Convention, ch. I, art. 1, May 29, 1993, S. Treaty Doc. 105-51; 42 U.S.C. § 14901(b)(2).  While this standard is undefined in the Convention and IAA, the Department has declared by regulation that the term "shall have the meaning given to it by the law of the State with jurisdiction to decide whether a particular adoption or adoption-related action is in a child's best interests."  22 C.F.R. § 96.2.  The term "State" means "the fifty States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, Guam, and the U.S. Virgin Islands."  *Id.*

28.     Given the imperative to prevent corruption and safeguard children, the process of adopting a child under the Hague Convention and the IAA is time-consuming and expensive.

---

[1] Peter H. Pfund, *The Hague Intercountry Adoption Convention and Federal International Child Support Enforcement*, 30 U.C. Davis L. Rev. 647, 649 (1997).

For prospective adoptive parents, an intercountry adoption typically costs between $25,000 and $45,000 and can take longer than two years to complete.  During that process, prospective adoptive parents must undergo a background check; submit detailed financial and personal information; solicit references from friends, family, and employers; and complete at least ten hours of training (among many other requirements).

29.      The most consequential part of this process is the home study, where an approved social worker reviews the prospective parents' application materials, visits the prospective parents' home, interviews and assesses the prospective parents, and writes a detailed report about the parents' fitness to adopt.  Frequently, where the social worker knows that the parents are hoping to adopt a specific child or a child with a particular need, the home study process will involve confirming the prospective parents' fitness to raise that specific child or care for the relevant condition.  For example, if a family intends to adopt a child with mobility difficulties, the home study would confirm whether the parents' home is wheelchair accessible.

30.      Adoption agencies are also carefully regulated.  With limited exceptions, no entity may provide an adoption service for an adoption governed by the Hague Convention unless the entity is accredited or supervised by an accredited provider.  42 U.S.C. § 14921(a); *see id.* § 14944 (imposing criminal and civil penalties for providing adoption services without accreditation or proper supervision).  To obtain accreditation, an agency must submit detailed documentation regarding its administrative structure, finances, casework records, policies and procedures, and personnel records.  The accreditation process involves an on-site evaluation; in-person review of documents, including financial records and policies; and interviews with staff, current and former clients, board members, and other relevant stakeholders.  Accreditation

typically remains valid for a four-year period, but all agencies are subject to ongoing monitoring, oversight, and reporting requirements.

31.     The Department has delegated accrediting decisions to a non-profit accrediting entity, which "make[s] accreditation and approval decisions based upon the standards and procedures in federal accreditation regulations,"[2] and must "operate under policy direction from the Department regarding U.S. obligations under the Convention."[3]

### B.      Prior Actions by the Department Have Already Drastically Reduced the Number of Intercountry Adoptions.

32.     Despite the tens of thousands of American families who are ready and willing to open their homes to children in need, the number of intercountry adoptions has plummeted in recent years.  From an all-time high of 22,989 adoptions in 2004, intercountry adoptions have decreased by nearly 80% to just 4,714 in 2017:



<hr />

[2] U.S. Dep't of State, *The Role of the Accrediting Entity*, https://travel.state.gov/content/travel/en/Intercountry-Adoption/about-adoption-service-providers/role-of-accrediting-entities.html (last visited Nov. 20, 2018); *see also* 22 C.F.R. § 96.7(c) ("An accrediting entity must perform all responsibilities in accordance with the Convention, the IAA, the UAA, the regulations implementing the IAA or UAA, and its agreement with the Secretary.").

[3] Memorandum of Agreement Between the U.S. Department of State Bureau of Consular Affairs and Intercountry Adoption Accreditation and Maintenance Entity, Inc., 82 Fed. Reg. 40,614, 40,615 (Aug. 25, 2017).

U.S. Dep't of State, *Adoption Statistics*, https://travel.state.gov/content/travel/en/Intercountry-Adoption/adopt_ref/adoption-statistics.html (image captured Nov. 20, 2018).

33.     Much of this decline is attributable to Departmental policies and actions that have made the process of intercountry adoption more difficult, more expensive, and more time consuming.  These actions have included imposing extensive new requirements on adoption agencies, authorizing significantly higher expenses for adoption agencies, and interfering with individual adoption agencies' accreditation processes.

34.     The situation threatened to grow even more dire in 2016, when the Department proposed new regulations that would have added additional layers of bureaucracy to the adoption process, subjected adoption agencies and prospective adoptive parents to onerous new financial burdens, and drastically increased the legal liability faced by U.S. adoption agencies.

35.     Reaction to the proposed rule was overwhelmingly negative, with comments in opposition registered by numerous adoption agencies, adoptive parents, prospective parents in the midst of the adoption process, adopted children, Members of Congress, the Small Business Administration, the Department's own designated accrediting entity, and other stakeholders. Following this public outcry, the Department withdrew the proposed regulations in April 2017.[4]

36.     Notably, the preamble to the Department's 2016 proposed regulations recognized that soft referrals are permitted under current law, stating expressly that "an agency *can* match a child to a family that has not completed its home study and training," 81 Fed. Reg. at 62,325 (emphasis added), and recognizing that children may be matched to prospective adoptive parents before the child's eligibility for intercountry adoption is confirmed, *id.* at 62,324.  The proposed

---

[4] *See* Notice of Withdrawal, 82 Fed. Reg. 16,322 (Apr. 4, 2017) (withdrawing 81 Fed. Reg. 62,322).

regulations would have placed limits on when and how soft referrals may be used, and would have prohibited adoption agencies from charging prospective adoptive families for certain adoption activities until after the parents have completed their training requirements.  *See id.* at 62,336–37 (proposing changes to 22 C.F.R. § 96.48(a)).  Because these proposed rules were withdrawn, they did not become law.

37.     Despite withdrawing the proposed rules, the Department has continued to take actions behind the scenes to implement its agenda, prompting outcry from the adoption community and provoking litigation.  Just weeks ago, the U.S. District Court for the Western District of Washington entered a preliminary injunction barring the Department's enforcement of a change in accreditation policy.  The district court found that the plaintiffs in that suit were likely to prove that the Department had improperly issued a legislative rule without engaging in notice and comment, and that the new rule was arbitrary and capricious because the Department failed to acknowledge (much less explain) its change in policy.[5]

**C.     The Department Adopts the Soft Referral Ban Without a Rulemaking.**

38.     In early 2018, the Department issued the Soft Referral Ban through a series of statements on its website and sent via email to adoption stakeholders, including accredited adoption agencies.  Although styled as "guidance," the Soft Referral Ban in fact imposes new substantive legal requirements on adoption agencies, and if permitted to stand, will further decrease the number of intercountry adoptions and cause longer stays in institutionalized care for children awaiting adoption.

---

[5] *Faith Int'l Adoptions v. Pompeo*, No. 2:18-cv-00731, 2018 WL 5619026 (W.D. Wash. Oct. 30, 2018).

1.     **Soft Referrals Serve Critical Humanitarian Interests.**

39.     A "soft referral" occurs when a child and prospective adoptive parents are "matched" for adoption either (a) before the child's eligibility for adoption is confirmed, or (b) before the prospective parents have completed the months-long home study process.  To be clear, neither requirement is excused in a soft referral.  Before any adoption can be completed, a home study must be conducted and the child's eligibility for adoption must be confirmed, in addition to other regulatory requirements.  Those requirements hold equally for soft referral adoptions.  When properly accompanied by informed consent, a soft referral thus allows prospective parents to plan for the adoption process with a particular child in mind.

40.     There are many reasons why an adoption agency, in consultation with child welfare officials in the child's country of origin, may make a soft referral.  For example, a soft referral may occur when a family in the United States wants to adopt the orphaned child of a family member living overseas.  Likewise, a soft referral may occur where adoptive parents wish to adopt a biological sibling or cousin of a child they have already adopted.  In those cases, the use of a soft referral supports the salutary objective of uniting an orphaned child with biological family members where doing so is possible and responsible.

41.     Soft referrals are also often used to aid children who encounter difficulty finding adoptive families due to their age or medical needs.  In particular, many special needs children have medical conditions that, while often deadly or debilitating in their country of birth, can be effectively treated or managed in the United States with proper care.  In these cases, it is often advantageous to match the child with prospective adoptive parents who have experience caring for the child's particular needs.  Where willing adoptive parents lack such experience, soft referrals in those cases also allow the home study and training process to go forward with the

child's particular needs in mind, giving parents the tools and confidence they need to raise a special needs child.

42.     Soft referrals may also be used to connect older special needs children with parents who are particularly suited to navigating the unique cultural and psychological challenges of adopting an adolescent.  As with domestic adoptions from foster care, those involved with intercountry adoptions of older children often find it preferable to arrange for a prospective adoptive parent to host the child before making an adoption commitment.  For more than two decades, hosting visits to the United States (where orphans are hosted by U.S. families with the permission of the children's country of origin) have been a successful way to help recruit prospective adoptive parents for older children.  A successful hosting visit will often lead to a soft referral, in recognition of the bond that was formed between the child and the prospective adoptive parent.

43.     Soft referrals are legally necessary for adoptions from certain countries to occur at all.  Countries such as the United Kingdom and Pakistan will not terminate parental rights until the time of the final adoption hearing.  In those cases, a child cannot be confirmed eligible for adoption until an adoptive parent is specified.  For children from these countries, the Soft Referral Ban creates a classic Catch-22—a child cannot be matched to a parent until after the child's eligibility to be adopted is confirmed, but the child's eligibility cannot be confirmed until after the child is matched to an adoptive parent.

44.     In addition, some adoptive processes *begin* with a soft referral—that is, with individuals or couples who were not even considering adoption being moved by a photograph of an adoptable child in an advocacy piece or hearing a story about a child in need during a presentation at their house of worship.  In those cases, the parents are not deciding to adopt any

child; they are deciding to go through the long and costly process of adopting that *specific* child. Without soft referrals, these prospective parents may never adopt.

45.     Some real-world examples illustrate how soft referrals help connect children in need to willing American families[6]:

a.     K.H. and C.H. are adoptive parents to three teenaged-to-adult children from Russia.  In 2017, the couple learned about A.H., an eight-year-old girl in China with a terminal heart condition that Chinese doctors had deemed inoperable.  The couple applied to adopt A.H., and during the home study process, K.H. and C.H. consulted with pediatric cardiologists around the country to ensure that, the moment the adoption was completed, their daughter could begin receiving medical care.  A.H.'s condition was very serious, and many doctors said they would not perform the surgery she would need.  K.H. and C.H. eventually found surgeons willing to operate on A.H., but even those surgeons warned that A.H.'s condition was advanced and could be fatal without immediate intervention.  Following a long surgery and months of ongoing care, A.H. has made a remarkable recovery.  In all likelihood, that recovery would not have been possible had K.H. and C.H. been forced to wait until their home study was complete to make an adoption commitment for A.H.  In short, A.H.'s soft referral likely saved her life.

b.     In 2013, E.C. and D.C. adopted W.A.C., a five-year-old boy from China who was suffering from a crippling spinal condition.  E.C. and D.C. were not intending to adopt at the time and certainly had not planned to adopt an older child with severe

---

[6] Individuals mentioned in this paragraph are persons known to NCFA, including clients of NCFA member adoption agencies, who have consented to share their adoption stories in connection with this litigation.  To protect their confidentiality, and in particular the privacy of the children involved, these individuals are identified only by their initials.  *See* LCvR 5.4(f)(2).

medical needs.  However, after seeing an advocacy video in December 2012 and knowing that the boy's condition could be deteriorating, E.C. and D.C. moved quickly to adopt W.A.C.  A soft referral allowed E.C. and D.C. to spend the money needed to obtain a home study with some confidence that they would be able to adopt him, and they were able to get W.A.C. the surgery he needed within a year of adopting him.  Today, W.A.C. is a happy, healthy, and mobile third grader.  But for his soft-referral adoption, he might instead still be confined to a bed in an orphanage.

> c.      In October 2015, K.S. and K.S. were matched with E.S., a young girl with a degenerative eyesight condition.  With a soft referral, K.S. and K.S. were able to undergo the research, training, and preparation needed to adopt a child with this condition while their home study was being performed, and they were able to welcome E.S. home in June 2016—months earlier than the adoption otherwise would have been completed. While treating her eyesight, E.S.'s doctors discovered that E.S. also had a more than 90% blockage in the arteries to her brain and could have suffered a potentially fatal stroke at any time.  Thankfully, E.S.'s doctors were able to operate quickly, and today E.S. enjoys swimming, horseback riding, singing, and reading—activities that she could never have done had a stroke destroyed her motor skills or ended her life.

46.     Soft referrals are used for similar reasons in domestic adoptions, which are governed by state law and interstate compact.  In many foster-care adoptions, states will not terminate birth parents' parental rights until the final adoption hearing.  Similarly, infant adoptions often involve matching prospective parents before the child's birth and thus, necessarily, before the child's eligibility for adoption is confirmed.  The federal government

funds the website www.adoptUSkids.org to highlight the need of foster children waiting on

adoptive families—a tool that uses public media to find parents for specific children in need.

> **2.      The United States Government Has Long Recognized Soft Referrals
> as a Lawful Practice in Intercountry Adoption.**

47.     Federal law has never previously prohibited soft referrals.  To the contrary, a

provision of the Department's formal regulations, in illustrating the proper operation of the

accreditation and approval requirements for intercountry adoption, expressly contemplates

scenarios where an agency "matches" a prospective family to a child and only later determines

that the prospective adoptive parents are a good placement for the child.  *See* 22 C.F.R.

§ 96.15(11).  There is no suggestion in the regulations that the agency's conduct in this example

is even potentially problematic.  The regulation indicates only that the hypothetical agency "is

performing an adoption service and must be accredited, approved, or supervised." *Id.*[7]

48.     The historic understanding that soft referrals are a lawful practice has been

underscored by the Department's own words.  In since-withdrawn proposed regulations, *see*

*supra* ¶ 34, the Department acknowledged that soft referrals were lawful under federal adoption

law and proposed to limit their use.  In the preamble to the proposed rule, the Department plainly

stated that soft referrals were permitted:  "Currently, an agency *can* match a child to a family that

has not completed its home study and training."  81 Fed. Reg. at 62,325 (emphasis added).

49.     Those proposed regulations would have limited (although not banned) soft

referrals by revising federal regulations to "prohibit agencies and persons from making a

---

[7] Similarly, U.S. Citizenship and Immigration Services has created a "Tip Sheet" that
addresses how a home study can be written when a prospective adoptive family has been
matched to a prospective adoptee.  *See* U.S. Citizenship & Immigration Servs., *Hague Home
Study Tip Sheet for Adoption Service Providers and Prospective Adoptive Parents (Form M-738
Instructions)*, https://www.uscis.gov/files/form/m-738.pdf.

referral … prior to the completion of certain required training." *Id.*; *see also id.* at 62,336–37 (proposing corresponding amendment to the text of 22 C.F.R. § 96.48(a)(1)).  This training is a part of (but not the totality of) the home study process.  The proposed regulations further would have prohibited agencies from charging prospective adoptive parents childcare fees, on the theory that such fees "may result in a situation where an adoptive family pays for longterm care of a child who is not in fact eligible for intercountry adoption." *Id.* at 62,324.  That scenario could arise only if a soft referral had been made before the child's eligibility is confirmed.

50.     In other words, just two years ago and in a formal publication, the Department confirmed that the common practice of soft referrals was permitted under existing law.  And just as importantly, the Department recognized that a new rulemaking would be required if it wanted to impose new limitations on the practice.

### 3.     The Department Prohibits Soft Referrals through "Guidance."

51.     Reversing its prior position regarding the legality of soft referrals, the Department adopted and implemented the Soft Referral Ban in 2018—and did so without undertaking a new rulemaking.  The Soft Referral Ban consists of three documents posted on the Department's website, each of which is styled as guidance.  First, in February 2018, the Department stated in conclusory fashion that "a 'soft referral' is not acceptable practice under the regulations." *See* Ex. A, at 7 (emphasis omitted).[8]  In saying this, the Department did not acknowledge its prior, contradictory statement that "an agency can match a child to a family that has not completed its home study and training." 81 Fed. Reg. at 62,325.

---

[8] U.S. Dep't of State, *Adoption Notice:  FAQ Part 2 – IAAME Schedule of Fees* (last updated Feb. 13, 2018), https://travel.state.gov/content/travel/en/News/Intercountry-Adoption-News/adoption-notice--faq--part-2--iaame-schedule-of-fees.html.

52.     A month later, on March 16, 2018, the Department issued the "Adoption Notice" that constitutes the heart of the Soft Referral Ban.[9]  The Adoption Notice begins by explaining that a "soft referral describes the act of matching a child to a family before confirmation of the child's eligibility to be adopted through the intercountry process and/or approval of the prospective adoptive parents' home study and associated background checks."  *See* Ex. B, at 1 (acronym and emphasis omitted).  The Department declared that both forms of soft referral are unlawful.  First, the Department announced that "[r]eferring a child who is not yet eligible for intercountry adoption is inconsistent with the Hague Adoption Convention, the Intercountry Adoption Act of 2000, the Universal Accreditation Act of 2012, and accreditation regulations." *Id.* at 2.  With respect to the second, "more common type of soft referral," the Department was equally blunt:  "U.S. accredited or approved adoption services providers should not take any action to 'hold' children for prospective adoptive parents who have not yet been found suitable." *Id.* at 5 (acronyms omitted).

53.     The Adoption Notice further calls for sanctions to be leveled against any adoption agency that makes a soft referral, stating that the accrediting entity—which is bound to follow the Department's guidance, *see supra* ¶ 31 & note 3—may take "adverse action" against any adoption service provider that makes a soft referral.  Ex. B, at 5.  The Adoption Notice asks that people who learn that an agency is performing soft referrals report the agency through the Department's "Complaint Registry."  *Id.* at 2.  Complaints submitted through the registry are routed to the accrediting entity, which investigates the complaint and "must take adverse action" if it determines the agency is not in compliance with intercountry adoption law.  *See* 22 C.F.R.

---

[9] U.S. Dep't of State, *Adoption Notice:  Guidance on Soft Referrals* (last updated Mar. 16, 2018), https://travel.state.gov/content/travel/en/News/Intercountry-Adoption-News/adoption-notice--guidance-on-soft-referrals.html.

§ 96.71(b).  Adverse action by the accrediting entity can take the form of an agency losing its

accreditation or being required to take remedial action.  *See* 42 U.S.C. § 14922(b)(3); 22 C.F.R.

§ 96.75.

54.     The Adoption Notice

- does not identify any provision of the Convention or of federal law that prohibits

  or even discourages soft referrals;

- does not acknowledge the Department's prior conclusion less than two years

  earlier that existing law *permits* adoption agencies to make soft referrals;

- does not explain why the Department believes a complete ban is necessary, when

  just two years earlier, it proposed regulatory changes that would have limited the

  practice without banning it wholesale; and

- does not consider at all the benefits of soft referrals in certain adoptions, despite

  expressly recognizing that soft referrals have been made where "the prospective

  adoptive parent is the child's relative or has specific experience with a child's

  unique special need."  Ex. B, at 3 (acronym omitted).

55.     After the Adoption Notice was posted, NCFA attempted to set up a meeting

between its members and the Department to explain the adoption community's concerns with the

Soft Referral Ban.[10]  The Department refused.  Remarkably, it claimed that "security concerns"

precluded the Department from meeting with U.S.-based non-profit adoption agencies or with

NCFA.  After being denied a meeting, NCFA sent the Department a set of written questions,

---

[10] *See* Letter from Ryan Hanlon, NCFA, to Carl Risch, U.S. Dep't of State, Regarding
U.S. Dep't of State's New Soft Referral Policy (June 13, 2018), *available at* https://
www.adoptioncouncil.org/files/large/1534dd53d38b102.

including questions aggregated from member adoption agencies; some of the questions that NCFA posed to the Department remain unanswered.

56.     In May 2018, the Department supplemented the Adoption Notice with an FAQ document.  *See* Ex. C.[11]  The FAQ states, without citation, that the Adoption Notice "clarifies existing policies based on current regulations that have been in place since 2006."  *Id.* at 1.  Yet like the Adoption Notice and the Department's initial "guidance," the FAQ fails to acknowledge or explain the Department's contrary declaration, in 2016, that existing law *permits* an adoption agency to "match a child to a family that has not completed its home study and training" or to match a family to a child who has not yet been deemed "eligible for intercountry adoption."  81 Fed. Reg. at 62,324–25.

57.     The FAQ describes soft referrals as categorically unlawful.  Echoing the Adoption Notice, it states, for example, that "[r]eferring a child who is not yet determined to be eligible for intercountry adoption … is inconsistent with the Hague Adoption Convention, the Intercountry Adoption Act of 2000, the Universal Accreditation Act of 2012, and accreditation regulations," and that adoption agencies "should not take any action" to match a child to families who have not completed their home study.  Ex. C, at 3, 7.  The FAQ, further, "encourage[s]" adoption agencies to maintain records and other documentation to "demonstrate that a child's file has not been … involved in a soft referral," and advises that the accrediting entity may have "additional requirements" to prove compliance with the Soft Referral Ban.  *Id.* at 12.

58.     None of the three Soft Referral Ban documents supplies any evidentiary basis for the Department's new view that all soft referrals are bad for children and must be banned.  The

___

[11] U.S. Dep't of State, *FAQ on Soft Referrals* (last updated May 2, 2018), https://travel.state.gov/content/travel/en/News/Intercountry-Adoption-News/faq-on-soft-referrals.html.

Soft Referral Ban relies on two anecdotal reports of misconduct, where a provider falsely indicated to the prospective adoptive parents that the child was eligible for adoption when, in fact, eligibility had not been established.  *See* Ex. B, at 1–2.  Unsurprisingly, deceptive conduct is already prohibited under existing laws and regulations.[12]

59.     Moreover, full disclosure is irrelevant to the Department's new rule.  The Soft Referral Ban states that "[r]eferring a child who is not yet determined to be eligible for intercountry adoption, *even if the prospective adoptive parent understands and agrees to this risk*, is inconsistent with the Hague Adoption Convention, the Intercountry Adoption Act of 2000, the Universal Accreditation Act of 2012, and accreditation regulations."  *See* Ex. C, at 3 (acronym omitted, emphasis added).  The Department's justification for this position underscores the substantive nature of the Soft Referral Ban:  "An adoption service provider's *legal responsibilities* cannot be waived by its clients."  *See id.* (acronym omitted, emphasis added).  That statement underlines the true nature of the Department's actions.  The Department has imposed "legal responsibilities" that regulate the conduct of adoption service providers by posting so-called guidance documents on the Department's website.

60.     Adoption agencies, foreign governments, and the Department's accrediting entity have all interpreted the Soft Referral Ban as imposing new substantive obligations on adoption service providers.  For example, the Bulgaria recently issued an "Outgoing Regulation" to U.S. adoption agencies, describing the Soft Referral Ban as "the instructions of the US State Department" and requiring adoption agencies to take certain steps to demonstrate compliance with the Ban.  Similarly, the Department's accrediting entity has threatened to strip the

---

[12] *See, e.g.*, 42 U.S.C. § 14944; 22 C.F.R. § 96.85; *see also, e.g.*, Katie Rasor et. al., *Imperfect Remedies:  The Arsenal of Criminal Statutes Available to Prosecute International Adoption Fraud in the United States*, 55 N.Y. L. Sch. L. Rev. 801 (2010).

accreditation of agencies that make soft referrals, and has investigated at least one NCFA

member for purported "non-compliance" with the Soft Referral Ban.

61.     The Soft Referral Ban has had and will continue to have a deleterious effect on all

involved in the intercountry adoption process.  The Soft Referral Ban will harm prospective

adoptive parents, who will either choose not to adopt because of the uncertainty, or will invest

thousands of dollars and years of their lives into adopting a specific child, only to learn at the last

minute that another family had already adopted that child.  Adoption agencies, too, will

experience—and indeed, already have experienced—adverse consequences as a result of the Soft

Referral Ban and the onerous new legal requirements it imposes.

62.     Ultimately, the Soft Referral Ban will harm children.  The Soft Referral Ban will

make intercountry adoption more difficult, more costly, and more emotionally trying—changes

that will inevitably decrease the number of families able and willing to commit to intercountry

adoption.  Some children will still be adopted, but will endure months or years longer in

institutionalized care before uniting with a loving family.  For other children, tragically, delay

will not be the only consequence.  Children with special medical conditions will continue to

suffer and even die from conditions that could have been managed, treated, or even cured in the

United States.  Others will age out of eligibility for adoption—as early as age fourteen in some

countries—and will never experience the joy of inclusion in a family.  As a direct result of the

Soft Referral Ban, thousands of children will be denied their only chance at a family.

## CAUSES OF ACTION

### COUNT ONE
### Failure to Engage in Notice-and-Comment Rulemaking
### 5 U.S.C. §§ 553, 706(A), (D)

63.     NCFA repeats and incorporates paragraphs 1 through 62 as if fully stated herein.

64.     The Soft Referral Ban prohibits any U.S. adoption service provider from facilitating soft referrals in intercountry adoptions.  This prohibition subjects adoption service providers to new legal obligations, including both affirmative obligations and legal prohibitions, that appear nowhere in the Hague Convention, the IAA, or federal adoption regulations.

65.     Defendants promulgated the Soft Referral Ban through a series of purported guidance documents posted to the Department's website.  These documents were never published in the Federal Register and were not subject to notice and comment.  By imposing new substantive legal requirements on regulated parties and effectively amending existing legislative rules without notice and comment, the Soft Referral Ban violates the APA.

66.     Defendants have asserted that the Soft Referral Ban merely "clarifies existing policies based on current regulations that have been in place since 2006."  Ex. C, at 1.  This statement is belied by the Department's own prior actions and statements.  The preamble to the Department's 2016 proposed rule expressly acknowledged that soft referrals are permitted under existing law.  The proposed rule itself sought to implement (through notice and comment) a more limited version of the Soft Referral Ban.  Having previously conceded that existing law permits soft referrals and initiating a rulemaking designed to limit (but not prohibit) soft referrals, the Department cannot credibly claim that the Soft Referral Ban does not mark a change in the law.  And its prior recognition that a rulemaking process was necessary to impose limited constraints on the soft referral practice supplies powerful evidence that the Department must proceed through notice and comment to implement a complete ban on soft referrals.

67.     Absent the Soft Referral Ban, Defendants would have no legal basis for enforcing a blanket prohibition of soft referrals.

### COUNT TWO
### Agency Action Contrary to Law
### 5 U.S.C. § 706(A), (C)

68.     NCFA repeats and incorporates paragraphs 1 through 67 as if fully stated herein.

69.     The Hague Adoption Convention and federal law requires that all adoption

actions be taken in "the best interest of the child."  Regulations implementing the IAA, in turn,

define the term "the best interest of child" to "have the meaning given to it by the law of the

[U.S.] State with jurisdiction to decide whether a particular adoption or adoption-related action is

in a child's best interests."  22 C.F.R. § 96.2.  In every state, moreover, the determination of a

child's best interests is made on a case-by-case basis, pursuant to a multi-factored analysis that

considers the child's unique situation.

70.     The Soft Referral Ban concludes soft referrals are never in the best interests of

children.  In reaching this decision, the Soft Referral Ban does not consider the requirements of

state law, and precludes consideration of the unique facts of each case, as they may bear on

whether a soft referral would serve the best interests of the particular child concerned.

71.     Because it decides categorically as a matter of federal law a question that, under

existing regulation, must be decided individually as a matter of state law, the Soft Referral Ban is

contrary to law.

### COUNT THREE
### Arbitrary and Capricious Agency Action
### 5 U.S.C. § 706(A)

72.     NCFA repeats and incorporates paragraphs 1 through 71 as if fully stated herein.

73.     The Soft Referral Ban categorically prohibits soft referrals.  This categorical

prohibition is arbitrary and capricious for several reasons.

74.     When an agency changes an existing rule or practice, it must evidence an

awareness of the change and provide a reasoned explanation for the new approach.  The Soft

Referral Ban fails this basic requirement.  On its face, the Soft Referral Ban does not even acknowledge that it is departing from decades of practice, much less justify that change or explain why it believes a complete ban is necessary when, in 2016, it proposed simply to limit and regulate soft referrals.  The Department, rather, specifically denied it was changing course.

75.     Further, the Soft Referral Ban does not give any weight to the reasons why soft referrals are ordinarily used or the benefits soft referrals can yield for children and prospective adoptive parents, including family unification or ensuring swift diagnosis and treatment of serious medical conditions that could result in lifelong disability or even death.  The Department also failed to consider whether its action would make adoptions more expensive, more difficult, or longer.  Nor did it weigh the balance between the positive effects of soft referrals and supposed negative effects that the Department cursorily mentioned but never sought to fully describe or quantify.  Finally, Defendants did not account for the perspective and experience of adoption service providers, social workers, adoptive families, or orphaned children.

76.     At most, the anecdotes described by the Department show that soft referrals, like practically any tool, can sometimes be misused.  On that point, there is no disagreement.  The Department could have responded to that possibility by issuing a true guidance document that identifies factors tending to indicate circumstances where a soft referral would or would not be appropriate, or that agencies ordinarily should consider before making a soft referral.  Instead, the Department took the dramatic step of prohibiting all soft referrals.  Such a sweeping rule requires a correspondingly meaningful justification.  The Department provided none.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NCFA respectfully asks the Court to order the following relief:

A.      Declare that the Department violated the Administrative Procedure Act by promulgating the Soft Referral Ban without notice and comment;

B.      Declare that the Soft Referral Ban's categorical definition of "the best interest of the child" as a matter of federal law is contrary to legislative rules defining that term;

C.      Declare that the Soft Referral Ban is arbitrary and capricious;

D.      Vacate the Soft Referral Ban;

E.      Enjoin Defendants from enforcing the Soft Referral Ban, directly or through agents, and require the Defendants to take clear steps to communicate that the Soft Referral Ban is not binding on adoption service providers;

F.      Award costs and reasonable attorney fees to the extent permitted by law; and

G.      Grant such other relief as this Court may deem just and proper.

Dated:  November 20, 2018            Respectfully submitted,

 /s/  Kwaku A. Akowuah
Kwaku A. Akowuah (D.C. Bar No. 992575)
C. Frederick Beckner III (D.C. Bar No. 451193)
Daniel J. Hay (D.C. Bar No. 1047969)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T:  (202) 736-8000
F:  (202) 736-8711
kakowuah@sidley.com
rbeckner@sidley.com
dhay@sidley.com
*Counsel for Plaintiff National Council For Adoption*