UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **NATIONAL COUNCIL FOR ADOPTION,** | ) ) ) ) | |
| **Plaintiff,** | ) ) ) | |
| v. | ) ) | Civil No. 18-2704 (RCL) |
| **MICHAEL R. POMPEO,** *et al.***,** | ) ) ) | |
| **Defendants.** | ) ) ) | |

## MEMORANDUM OPINION

Plaintiff National Council for Adoption ("NCFA") brings this action against defendants alleging violations of the Administrative Procedure Act. At issue are a series of written statements styled as guidance documents pertaining to soft referrals (the "soft referral guidance" or "SRG").

Before the Court are defendants' motion to dismiss, motion for summary judgment, and motion to strike. ECF Nos. 21, 42, 60. Also before the Court is plaintiff's motion for summary judgment. ECF No. 43. For the reasons that follow, the Court will hold that plaintiff does not have standing to bring this suit. Accordingly, the Court will grant defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). The Court will also grant defendants' motion to strike and deny as moot both motions for summary judgment.

## Background

Congress enacted the Intercountry Adoption Act of 2000, 42 U.S.C. § 14901 *et seq.*, ("IAA") to implement the Hague Convention on Protection of Children and Cooperation in Respect of Intercountry Adoption (the "Convention" or "Hague Convention"). The IAA's purpose is to "protect the rights of, and prevent abuses against, children, birth families, and adoptive parents

involved in adoptions (or prospective adoptions) subject to the Convention, and to ensure that such adoptions are in the children's best interests[, ] and to improve the ability of the Federal Government to assist United States citizens seeking to adopt children from abroad and residents of other countries party to the Convention seeking to adopt children from the United States." *Id.* §§ 14901(b)(2), (b)(3).

To facilitate Hague Convention adoptions in the United States, the IAA and its implementing regulations, 22 C.F.R. § 96.1 *et seq.*, require adoption service providers ("ASP") to be accredited in accordance with the statute. 42 U.S.C. § 14921(a). Under the IAA, accrediting entities, which are designated by the State Department, process prospective ASPs' applications for accreditation and renewals of accreditation, and monitor their compliance with accreditation standards. 42 U.S.C. § 14922(a); 22 C.F.R. § 96.12. ASPs cannot provide adoption services (as defined by the IAA), including identifying a child for adoption and arranging the adoption of children by prospective adoptive parents, until they are accredited. This process can sometimes include "matching" a child with prospective adoptive parents. But the relevant governmental agency or entity of the child's country of origin (known as the Central Authority or competent authority) bears the ultimate responsibility for making a "referral" (a formal determination that a particular child should be placed with a particular family for adoption). The adoption community has coined the term "soft referral" to refer to a "matching" process by an ASP that is not an official referral.

The IAA authorizes the State Department to develop standards and compliance obligations that ASPs must meet in order to obtain and maintain accreditation. *See* 22 C.F.R. Part 96 Subpart F. Among those obligations, ASPs must make sure that they "provide[] adoption services ethically and in accordance with the [Hague] Convention's principles of: (1) [e]nsuring that intercountry

adoptions take place in the best interests of children; and (2) [p]reventing the abduction, exploitation, sale, or trafficking of children." 22 C.F.R. § 96.35(a).

The IAA's implementing regulations also include specific guidelines for cases in which an adopted child is immigrating to the United States. *See* 22 C.F.R. §§ 96.47–96.52 ("incoming" case standards). One of the primary requirements is the completion of a "home study" on any prospective adoptive parents. *Id.* § 96.47. A home study involves the collection of "[i]nformation about the prospective adoptive parent(s)' identity, eligibility and suitability to adopt, background, family and medical history, social environment, reasons for adoption, ability to undertake an intercountry adoption, and the characteristics of the children for whom the prospective adoptive parent(s) would be qualified to care (specifying in particular whether they are willing and able to care for a child with special needs)." *Id.* § 96.47(a)(1). Home studies must also include "[a] determination whether the prospective adoptive parent(s) are eligible and suited to adopt; . . . [a] statement describing the counseling and training provided to the prospective adoptive parent(s); . . . [t]he results of a criminal background check on the prospective adoptive parents," and any additional information required by the child's Central Authority. *Id.* §§ 96.47(a)(2)–(5). According to plaintiff, "[t]he most consequential part of [the adoption] process is the home study[.]" Compl. ¶ 29, ECF No. 1.

Plaintiff NCFA, by its own words, is a non-profit organization that advocates for and promotes a culture of adoptions. *Id.* ¶ 13. NCFA was founded in 1980 and has grown to an association of approximately 100 adoption agencies. *Id.* A majority of those agencies are accredited to facilitate intercountry adoptions. *Id.*

Plaintiff filed the instant case challenging a series of written statements—issued by defendants—pertaining to soft referrals, referred to by plaintiff as the "soft referral ban." *Id.* ¶ 4.

Between February 13 and May 2, 2018, the State Department published three public notices (styled as guidance documents) concerning soft referrals. *See id.* ¶ 38; *id.* Exs. A ("February 13 Notice"), B ("March 16 Guidance"), and C ("May 2 FAQs") (together, "SRG").

Soft referrals "occur[] when a child and prospective adoptive parents are 'matched' for adoption either (a) before the child's eligibility for adoption is confirmed, or (b) before the prospective parents have completed the months-long home study process." *Id.* ¶ 39. Put differently, ASPs sometimes make soft referrals of a child to prospective adoptive parents before the child can, consistent with U.S., foreign, and international law, be adopted, or that the parents can, consistent with such laws, adopt any child. *See id.* But the child may not be officially adopted until those legal requirements are met. *See id.*

On February 1, 2018, the State Department published a notice explaining the fee schedules for the new accrediting entity, Intercountry Adoption Accreditation and Maintenance Entity, Inc. ("IAAME"). Maskew Decl. ¶ 3, ECF No. 21-1. Under its fee schedule, ASPs must report each new case to IAAME because its monitoring and oversight fees for each ASP are based on that ASP's number of cases. *Id.* ¶ 3. On February 5, 2018, the Department held conference calls with ASPs to answer questions about the fee schedule, including questions about the point in the adoption process at which a prospective adoptive parent "counts" as a new case that must be reported to IAAME. *Id.* ¶¶ 3–4. During one of such calls, an ASP asked State Department representatives if a soft referral counts as providing an adoption service that would trigger the requirement to report a new case to IAAME. *Id.* ¶ 4. A representative responded that a soft referral should not be the first event in a case that creates an obligation to report the case to IAAME but "confirmed that if an ASP did somehow make a 'soft referral' to a Prospective Adoptive Parent or

parents prior to other activity on their adoption case, that would be considered a new case and the new case fee would be payable." *Id.* ¶ 4.

Following the February 5 calls, the Department published the February 13 Notice, a public notice with answers to Frequently Asked Questions from ASPs. *See generally* Compl. Ex. A. This notice stated, among other things, that "[i]n response to a specific question received from an ASP, the Department notes that a 'soft referral' is not acceptable practice under the regulations and may lead to adverse action." *Id.* at 7. In response to the February 13 Notice's statement regarding soft referrals, many ASPs asked the State Department for clarification. Maskew Decl. ¶ 6. According to Ms. Maskew, "it became clear that the term 'soft referral' was used [by ASPs] to refer to a far wider set of situations than had been implied by the question during the February 5 call." *Id.*

In response to these requests for clarification, the State Department published the second portion of the SRG. *See generally* Compl. Ex. B. The March 16 Guidance clarified the State Department's position regarding the legality of soft referrals and explained that two specific types of soft referrals are prohibited. The first practice concerns soft referrals "involving a child not yet determined to be eligible for intercountry adoption." *Id.* at 1. The guidance explains that "[t]his type of soft referral involves the . . . [ASP] informing a [prospective adoptive parent] about a specific child" before the Central Authority in the child's country of origin has determined that the child is eligible for intercountry adoption under that country's law or has "found intercountry adoption to be in the child's best interests." *Id*. Making this type of soft referral could result in "harm[] to both the child and the [prospective adoptive parents]," *id.*, and because of this risk of harm, the Guidance claims that this practice is inconsistent with the Hague Convention and with the IAA's implementing regulations. *Id.* at 2.

The March 16 Guidance explains that a "more common type of soft referral involves ASPs matching an eligible/adoptable child to a [prospective adoptive parent] who does not have an approved home study, in a manner that removes that child from consideration by other families that the Central or competent authority may wish to consider." *Id.* at 2–3. The March 16 Guidance explains that this second practice, "sometimes referred to as 'holding' the child," is improper. *Id.* at 3. According to the guidance, the practice of holding "effectively deprives the Central [A]uthority" in the child's country of origin "of the opportunity to [place the child elsewhere when it is] in the child's best interest." *Id.* at 5. Holding a child also prevents other ASPs from determining whether different prospective adoptive parents might be a better fit for the child.

Following the March 16 Guidance, the State Department posted additional guidance in the form of Frequently Asked Questions on May 2, 2018. *See generally* Compl. Ex. C. The May 2 FAQs addressed various scenarios related to soft referrals, and in doing so, it states that some forms of soft referrals are lawful and available to ASPs. The May 2 FAQs states that ASPs may, in some cases, identify an eligible adoptive child to a prospective adoptive family that has not yet completed its home study, but must do so in a manner that does not "hold" the child from consideration by other families or by the authorities of the child's country of origin. *See id.* at 10. The May 2 FAQs also claims that the March 16 Guidance "clarifie[d] existing policies based on current [intercountry adoption] regulations that have been in place since 2006." *Id.* at 1.

Plaintiff filed this lawsuit on November 20, 2018, and asks the Court to declare the soft referral guidance unlawful and enjoin its implementation. *See* Compl. at 28. The Complaint asserts three causes of action: Count One alleges that the SRG violates the procedural requirements of the Administrative Procedure Act ("APA"), *id.* ¶¶ 63–67, and Counts Two and Three allege that

the SRG violates substantive requirements of the APA because it contravenes state law and is arbitrary or capricious, respectively. *Id.* ¶¶ 68–76.

### 1. The SRG (or "Soft Referral Ban") is not a Categorical Ban on all Soft Referrals

Plaintiff argues in multiple submissions that the SRG is a categorical ban on all soft referrals. *See, e.g.*, Compl. ¶ 9; Pl.'s Am. Mem. Opp. Mot. Dismiss 9, ECF No. 39; Pl.'s Mot. Summ. J. 9, ECF No. 43; Pl.'s Reply Mot. Summ. J. 3, ECF No. 59. This is a mischaracterization of the SRG. Although the February 13 Notice may have led some ASPs to believe that the State Department sought to prohibit all soft referrals, the Department quickly resolved any confusion in issuing the March 16 Guidance and May 2 FAQs. As discussed above, these documents describe two prohibited soft referral practices and assure ASPs that other types of soft referrals may be permissible.

According to Ms. Maskew, the March 16 Guidance "did *not* impose a complete ban on 'soft referrals,' but rather identified specific ASP conduct as unlawful under the Hague Convention, the . . . IAA, and the Department's accreditation regulations." Maskew Decl. ¶ 7. Although the Court takes no position on whether the SRG merely clarified existing obligations or created new ones, the Court agrees that the SRG is not a categorical ban on all soft referrals. Defendants' position very clearly comports with the SRG's text.

### 2. Defendants Did Not "Rewrite the Soft Referral Ban"

When confronted with evidence that the SRG is not a categorical ban on all soft referrals, plaintiff responded by arguing that defendants have "rewrit[ten]" the SRG for purposes of litigation such that it "prohibit[s] only *some* soft referrals." Pl.'s Mot. Summ. J. 42 (emphasis in original). But defendants have described the SRG in a manner that closely tracks its text. *See, e.g.*, Defs.' Mot. Dismiss 3–9, ECF No. 21; Defs.' Reply Mot. Dismiss 1–8, ECF No. 41; Defs.'

7

Mot. Summ. J. 4–9, ECF No. 42. The Court agrees with defendants. Since the State Department issued its March 16 Guidance and further clarified the SRG in the May 2 FAQs, defendants have maintained a consistent interpretation of the SRG.

## **Standing**

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Consequently, 'a showing of standing is an essential and unchanging predicate to any exercise of a court's jurisdiction.'" *Strunk v. Obama*, 880 F. Supp. 2d 1, 3 (D.D.C. 2011) (citing *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (internal quotations omitted)).

To establish standing in its own right, an organization must, "like an individual plaintiff, [] show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)).

To demonstrate injury in fact, "[a]n organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). Rather, an organization wishing to establish standing must have "suffered a concrete and demonstrable injury to [its] activities." *People for the Ethical Treatment of Animals v. USDA*, 797

F.3d 1087, 1093 (D.C. Cir. 2015) (internal quotations omitted) [hereinafter, "PETA"] (quoting *Equal Rights Ctr.*, 633 F.3d at 1138). This determination is made through a two-part inquiry—the Court asks "first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Id.* at 1094 (quoting *Equal Rights Ctr.*, 633 F.3d at 1140).

To satisfy these elements, the challenged conduct must "perceptibly impair[] the organization's ability to provide services." *Food & Water Watch*, 808 F.3d at 919 (quoting *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)). It must inhibit the organization's daily operations, *PETA*, 797 F.3d at 1094, or "ma[k]e the organization's *activities* more difficult." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (emphasis in original).

To establish associational standing, plaintiff must demonstrate: (1) that at least one member would have Article III standing in its own right; (2) that the interests it seeks to protect are germane to its purposes; and (3) neither the claim asserted nor the relief requested requires an individual member participate in the lawsuit. *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007).

"When reviewing a challenge pursuant to Rule 12(b)(1), the Court may consider documents outside the pleadings to assure itself that it has jurisdiction." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003) (citing *Land v. Dollar*, 330 U.S. 731, 735 n. 4 (1947)); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("In 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'" (citations omitted)). "The parties may produce affidavits and other materials

to support their position on subject matter jurisdiction, and the court is free to weigh such evidence in assessing its power to decide the case." *Tozzi v. EPA*, 148 F. Supp. 2d 35, 41 (D.D.C. 2001).

Plaintiff's mischaracterization of the soft referral guidance fatally taints its standing arguments.

### 1. *Plaintiff Lacks Organizational Standing*

For plaintiff, the first step in demonstrating organization standing is proving that the SRG injured plaintiff's interest. Plaintiff argues that the SRG has caused a "concrete and demonstrable injury" beyond any "abstract social interest." Pl.'s Am. Mem. Opp. Mot. Dismiss 29 (quoting *Elec. Priv. Info. Ctr. v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017)). Defendants argue otherwise and claim that plaintiff's injury is merely a dispute over policy. *See* Defs.' Mot. Dismiss 15; *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 201 (D.D.C. 2015), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015) (an advocacy organization's dispute "with the manner in which the [government agency] is going about achieving the [policy] goal . . . is a dispute about *methodology*, not a conflict between the organization's mission and the agency's action that qualifies as an injury-in-fact").

Plaintiff alleged in its complaint that its mission is to "advocate[] for and promote[] a culture of adoptions." Compl. ¶ 13. Plaintiff argues that "[t]he Department's ban has actively impaired NCFA's own activity" because "by banning this critical tool [of soft referrals], NCFA cannot offer the same advice and guidance, either to its members or to adoptive families." Pl.'s Am. Mem. Opp. Mot. Dismiss 30. And so, according to plaintiff, "it is sufficient at the pleading stage for NCFA to allege that the Department's actions in prohibiting the use of soft referrals are inconsistent with NCFA's objectives." *Id.* But these assertions are based on a mischaracterization of the SRG; because plaintiff has mischaracterized the SRG, there is no way for the Court to

10

measure whether the SRG is actually "at loggerheads" with plaintiff's interest in promoting a culture of adoptions. *See Nat'l Treasury Emps. Union*, 101 F.3d at 1426.

Furthermore, plaintiff does not explain how the SRG (as written) constitutes an "'inhibition of [NCFA's] daily operations.'" Pl.'s Am. Mem. Opp. Mot. Dismiss 30 (citing *PETA*, 797 F.3d at 1094). Plaintiff has thus failed to demonstrate that the SRG has caused an injury beyond any "abstract social interest," *see Elec. Priv. Info. Ctr.*, 878 F.3d at 378, so plaintiff lacks organizational standing.[1]

### *2. Plaintiff Also Lacks Associational Standing*

Because plaintiff lacks organizational standing, plaintiff cannot advance its claims unless it has associational standing. The first step in demonstrating associational standing is proving that at least one of its members would have Article III standing in its own right. *Nat. Res. Def. Council*, 489 F.3d at 1370. To prove this, plaintiff argues that standing is clear from the administrative record. Pl.'s Am. Mem. Opp. Mot. Dismiss 17. Plaintiff also attached ten member declarations to its amended response to defendants' motion to dismiss. Nine of the declarations are from named ASPs who are members of NCFA, and the tenth is a declaration of an attorney representing an unnamed ASP member of NCFA.

### *a. Plaintiff's Standing is not Self-Evident*

Plaintiff claims that standing is self-evident because its members are "the object" of a governmental action. *Id.* at 15 (citing *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002)). If plaintiff's standing is self-evident, then "no evidence outside the administrative record is necessary for the court to be sure of it." *Sierra Club*, 292 F.3d at 899–900.

---

[1] The Court need not examine whether plaintiff expended resources to counteract the SRG's effects because plaintiff has not demonstrated any concrete injury to its interests. *See Ctr. for Biological Diversity v. United States Dep't of State*, No. 18-563, 2018 WL 5840515, at *3 (D.D.C. Nov. 8, 2018) (describing the two-step process).

But after the *Sierra Club* decision, the D.C. Circuit clarified that "*Sierra Club* did not alter the precedent of this circuit," but rather "reminds [plaintiffs] challenging administrative actions that, *when they have good reason to know their standing is not self-evident*, they should explain the basis for their standing at the earliest appropriate stage in the litigation." *Am. Library Ass'n v. FCC*, 401 F.3d 489, 493–95 (D.C. Cir. 2005). Plaintiff's claim that its standing is self-evident "is not dispositive of the issue, . . . [a]nd if a party raises a comprehensible challenge to a [plaintiff's] standing, the [plaintiff] is well advised to respond with precision and clarity to make it clear that standing is present." *Id.* at 494–95. Only where "it was 'inconceivable' that the regulation 'would fail to affect . . . even a single' member of the association," does the D.C. Circuit conclude that standing is "self-evident." *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176 (D.D.C. 2008) (quoting *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895–96 (D.C. Cir. 2006)). Defendants here have raised a "comprehensible challenge" to plaintiff's standing by pointing out how plaintiff has mischaracterized SRG.

Furthermore, it is not even clear that at least one of plaintiff's members is an "object of" the SRG. Plaintiff acknowledges that "[s]oft referrals do not occur in all or even most intercountry adoptions—nor should they," Pl.'s Am. Mem. Opp. Mot. Dismiss 5, and the SRG addresses only two types of soft referrals. So it is not "inconceivable" that none of plaintiff's members were affected by the SRG. *See S. Coast Air Quality Mgmt. Dist.*, 472 F.3d at 895–96.

Plaintiff's standing is not self-evident, so the Court must examine the administrative record for evidence of associational standing.

b. *Plaintiff's Standing is not Clear from the Administrative Record*

Plaintiff argues that the administrative record demonstrates that its members are directly regulated by the SRG, so this should suffice for standing purposes. Pl.'s Am. Mem. Opp. Mot.

Dismiss 17–18.  Plaintiff cites to several correspondences between its members and State Department employees to prove that they ceased making soft referrals due to the SRG.  *See id.* at 17–19 (citing AR00163–64; AR00177–78; AR00315; AR00325; AR00508; AR00553).  But none of these correspondences demonstrate that any of plaintiff's members had previously made the prohibited types of soft referrals and ceased making them because of the SRG.[2]  Defendants urge the Court to resist reading the administrative record in a way that "extrapolate[s] particularized injuries from three generic communications from ASPs broadly discussing various soft referral issues."  Defs.' Reply Mot. Dismiss 21.  The Court will heed that request and decline to find an injury that is not present in the administrative record.[3]

Plaintiff states that "the administrative record leaves no question that NCFA members have been affected by the Soft Referral Ban."  Pl.'s Am. Mem. Opp. Mot. Dismiss 19.  If the SRG was a categorical ban on all soft referrals, then plaintiff's arguments would be much stronger.  But as the Court has already established, that is a mischaracterization of the SRG.  And so, because the administrative record fails to establish that any of plaintiff's members previously made the prohibited types of soft referrals and ceased making them because of the SRG, the administrative record cannot provide grounds for associational standing.[4]  And so, the Court must examine plaintiff's ASP member declarations for evidence of associational standing.

---

[2] Plaintiff also points out an email from one of its members (Gladney Center for Adoption) that states that many adoptive families have "expressed their sincere belief that they would not have gone through the adoption process without being able to identify a child for adoption at the beginning of the paperwork process."  Pl.'s Am. Mem. Opp. Mot. Dismiss 19 (quoting AR00325).  But "identifying" a child is not the same as "holding" a child—"identifying" a child to prospective parents is still permissible when appropriate under the SRG, but "holding" a child is not.

[3] Plaintiff also cites to correspondences between its own representatives and the State Department.  *See* Pl.'s Am. Mem. Opp. Mot. Dismiss 19 (citing AR00396; AR00549; AR00629–31).  These correspondences also fail to demonstrate associational standing because plaintiff cannot articulate a concrete and particularized injury on behalf of its members—that is for them to demonstrate through their statements and declarations.

[4] Furthermore, any injury caused by the confusion surrounding the February 13 Notice would have been cured by the March 16 Guidance and May 2 FAQs.  Those documents make clear that the SRG is not a categorical ban on all soft referrals.

   c. *Plaintiff's Member Affidavits Do Not Establish Associational Standing*

Most of plaintiff's member declarations follow a pattern that is, on its face, insufficient to demonstrate associational standing. Take, for example, Ms. Kaiser's declaration. She begins by mischaracterizing the SRG:

> I understand that, in filings submitted for this litigation, the Department of State has taken the position that a soft referral is unlawful when a child and prospective adoptive parents are "matched" before the child has been deemed eligible for adoption or when an adoption service provider matches a waiting child's file with prospective adoptive parents that are still completing the home-study process.

Kaiser Decl. ¶ 3, ECF No. 39. She then states that her organization had previously made now prohibited soft referrals and ceased doing so because of the SRG. *See id.* ¶¶ 4–5. According to Ms. Kaiser, but for the SRG, her organization would continue making soft referrals. *See id.* ¶ 5.

As the Court has already established, the SRG is not a categorical ban on all soft referrals. The Court has no way of knowing which members, if any, engaged in the prohibited types of soft referrals prior to the SRG. And so, because the declarants also misunderstood the SRG, their statements do not describe an injury in fact caused by or fairly traceable to the SRG.

Although most of the declarations very clearly fail to demonstrate associational standing due to their mischaracterization of the SRG, two declarations require more attention.

   i.   *Perilstein Declaration*

Ms. Perilstein's Declaration comes closest to demonstrating associational standing. Like the other declarants, Ms. Perilstein mischaracterizes the SRG:

> I understand that the Department of State has taken the position that a soft referral is unlawful when a child and prospective adoptive parents are "matched" before the child has been deemed eligible for adoption or when an adoptive service provider matches a waiting child's file with prospective adoptive parents who have not completed the home study process.

14

Perilstein Decl. ¶ 3, ECF No. 39. Although she does not explicitly state that her organization had previously engaged in the "holding" of children, she does state that her organization "received many inquiries from pre-homestudy families about particular waiting children, but they declined to begin a homestudy or the adoption process without some assurance that the specific child of interest to them would be available for them to adopt when their homestudy was complete." *Id.* ¶ 5.

But Ms. Perilstein does not explain what she meant by "some assurance." This statement is far too vague to be considered an admission that her organization held children for particular pre-homestudy parents and would continue to do so but for the SRG. Furthermore, the Court cannot infer causation because of Ms. Perilstein's mischaracterization of the SRG. *See id.* ¶ 5 (quoting the February 13 Notice without providing any other information about the scope of the SRG). If her organization has ceased making all soft referrals, even non-prohibited ones, because of her organization's misunderstanding of the SRG, then that is an injury of her organization's own doing.

> ii.   *Nehrbass Declaration*

Similarly, in Dr. Nehrbass' declaration, he makes a vague statement about prospective adoptive parents needing to be able to gauge the likelihood that a particular child will be available for them:

> Becoming an adoptive parent is a large risk for people, and they envision a daunting life-change. But they are willing to take this risk when they fall in love with a particular child or they feel drawn (called) to a particular child. If people are not able to gauge the likelihood of adopting a particular child and gain child-specific training prior to committing to an adoption, they are not going to adopt at all.

Nehrbass Decl. ¶ 5, ECF No. 39. Like Ms. Perilstein's statement regarding assurance, this statement is far too vague to be considered an admission that his organization held children for

15

particular pre-homestudy parents before the SRG and would continue to do so but for the SRG. If his organization has ceased making all soft referrals, even non-prohibited ones, because of his organization's misunderstanding of the SRG, then that is an injury of his organization's own doing. Accordingly, Dr. Nehrbass' declaration also fails to establish associational standing.

\*\*\*\*\*\*\*\*\*\*\*

Plaintiff lacks associational standing because none of its members have demonstrated that they would have Article III standing in their own right. Because plaintiff has failed to demonstrate either organizational or associational standing, the Court must grant defendant's motion to dismiss pursuant to Rule 12(b)(1).

### 3. *Defendants' Motion to Strike*

In a late effort to establish associational standing, plaintiff attached to its reply brief (in support of its motion for summary judgment) supplemental declarations from Ms. Perilstein and Dr. Nehrbass that provide stronger evidence of associational standing. Both declarations claim that the State Department has essentially rewritten the SRG and limited its scope during this litigation. *See* Supp. Perilstein Decl. ¶ 2, ECF No. 59-1; Supp. Nehrbass Decl. ¶ 2, ECF No. 59-2. Additionally, they at least imply that they had previously made the prohibited types of soft referrals and would have continued to make them but for the SRG. *See* Supp. Perilstein Decl. ¶¶ 3–4; Supp. Nehrbass Decl. ¶ 3.

But the Court finds the timing of the submission of these declarations troubling. Defendants' motion to dismiss clearly laid out the government's position from early on in this litigation—that the SRG is not a categorical ban on all soft referrals. The Court permitted plaintiff to amend its response to defendants' motion to dismiss, in part, so that it would have enough time to collect its members' declarations. *See* Pl.'s Mot. Amend Mem. Opp. Mot. Dismiss ¶ 4, ECF

No. 33.  Yet plaintiff waited until the very end of briefing its summary judgment motion to add these supplemental declarations.

Plaintiff is asking the Court to consider these declarations for purposes of standing while arguing on the merits that the SRG is a categorical ban on all soft referrals.  *See* Pl.'s Am. Mem. Opp. Mot. Dismiss 9; Pl.'s Mot. Summ. J. 9.  Plaintiff even argues in its reply brief—the very document which the supplemental declarations are attached to—that the SRG is a categorical ban on all soft referrals.  *See* Pl.'s Reply Mot. Summ. J. 3.  If the SRG actually did categorically ban all soft referrals, the Court suspects that plaintiff's case on the merits would be stronger.  And so, plaintiff's submission of these revised declarations amounts to asking the Court to consider different arguments for purposes of establishing standing and adjudicating the merits.  The Court declines to do so.

The Court acknowledges that "[a] motion to strike is considered an exceptional remedy and is generally disfavored, and the proponent of such a motion must shoulder a formidable burden." *United States ex rel. K&R Limited Partnership v. Massachusetts Housing Finance Agency*, 456 F. Supp. 2d 46, 53 (D.D.C. 2006) (internal quotations and citations omitted).  Had plaintiff submitted member declarations that accurately reflected the SRG's scope in response to defendants' motion to dismiss, perhaps the Court would not have to resort to such an exceptional remedy.  But striking these revised declarations is appropriate here because defendants would be considerably prejudiced by plaintiff's eleventh-hour submission—after the merits had already been briefed.

Plaintiff cannot have its cake and eat it too.  Accordingly, the Court will grant defendants' motion to strike.

**Conclusion**

The Court cannot ascertain why plaintiff opted to characterize the SRG as a categorical ban on all soft referrals. Perhaps plaintiff's members were reluctant to explicitly admit that they had previously engaged in the two prohibited practices and intended to continue doing so, or perhaps plaintiff thought that describing the SRG as a categorical ban would strengthen its arguments on the merits. Regardless of the reason, plaintiff's mischaracterization of the SRG fatally tainted its ability to prove it has standing to bring this suit.

Because plaintiff lacks standing, the Court cannot resolve the merits of the complaint. Accordingly, the Court will grant defendants' motion to dismiss and motion to strike and deny as moot both motions for summary judgment. A separate order follows.

Date: May 19, 2020                                    /s/ Royce C. Lamberth
                                                                                         Royce C. Lamberth
                                                                     United States District Court Judge